## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LEAF FUNDING INC<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>CITY REALTORS, INC. d/b/a REMAX<br>CITY REALTORS, HENRY SAKOWSKI<br>and MARIUSZ LATA,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

```
FILED:   JUNE 26 , 2008
    08CV3649
    JUDGE GETTLEMAN
    MAGISTRATE JUDGE COLE
    NF
```

No.

### COMPLAINT

Plaintiff, LEAF Funding, Inc. ("LEAF"), for its Complaint against Defendants, City Realtors, Inc. d/b/a REMAX City Realtors ("City Realtors"), Henry Sakowski ("Sakowski"), and Mariusz Lata ("Lata"), states as follows:

### JURISDICTION AND PARTIES

1.　　　Plaintiff, LEAF is a Delaware Corporation with its principal place of business in Wilmington, Delaware.

2.　　　Defendant, City Realtors is an Illinois corporation with its principal place of business located at 8906 S. Octavia, Bridgeview, IL 60455.

3.　　　Defendant, Sakowski is a citizen of Illinois who resides at 702 S. River Road, Naperville, IL 60540.

4.　　　Defendant, Lata is a citizen of Illinois who resides at 622 Cochise Drive, LaGrange, IL 60525.

5.　　　This Court has jurisdiction pursuant to 28 U.S.C. §1332.  Venue is proper pursuant to 28 U.S.C. §1391(a).

## BACKGROUND FACTS

6.      On or about January 25, 2006, Five Point Capital, Inc. ("Five Point"), as Lessor, and City Realtors, as Lessee, executed a lease agreement (the "Lease Agreement") with respect to certain equipment described in that agreement (the "Equipment"). (A copy of the Lease Agreement is attached as "Exhibit A.")

7.      Under the Lease Agreement, upon default, City Realtors agreed to pay all past due and all remaining payments due, plus interest, to return the Equipment at its expense, and to pay the reasonable collection costs and attorneys' fees, among other obligations.

8.      Under the Lease Agreement, City Realtors agreed to make 60 monthly payments of $1,763.81.

9.      On or about January 25, 2006, Lata, acting as the President of City Realtors, signed the Acknowledgement and Acceptance Certificate (the "Acceptance") and certified that City Realtors had received and accepted the Equipment as satisfactory. (A copy of the Acceptance is attached as "Exhibit B.")

10.     On or about January 25, 2006, to secure payment of the indebtedness under the Lease Agreement, Sakowski executed a Lease Guaranty (the "Sakowski Guaranty"), under which he absolutely and unconditionally agreed to repay all monies owed by City Realtors under the Lease Agreement, plus the costs of collection, including reasonable attorneys' fees. (A copy of the Sakowski Guaranty is included within the Lease Agreement, attached as "Exhibit A.")

11.     On or about January 25, 2006, to secure payment of the indebtedness under the Lease Agreement, Lata executed a Lease Guaranty (the "Lata Guaranty"), under which he absolutely and unconditionally agreed to repay all monies owed by City Realtors under the Lease

Agreement, plus the costs of collection, including reasonable attorneys' fees. (A copy of the Lata Guaranty is included within the Lease Agreement, attached as "Exhibit A.")

12.     On or about February 24, 2006, City Realtors and Five Point executed an Addendum to the Lease Agreement under which the monthly installment paid by City Realtors was raised to $1,922.55. (A copy of the Addendum is included with the Lease Agreement, attached as "Exhibit A.")

13.     On or about March 14, 2006, Five Point, as Assignor, and Santa Barbara Bank & Trust, a division of Pacific Capital Bank, N.A. ("PCB"), as Assignee, executed a Lease Assignment and Security Agreement ("Assignment Agreement") under which the Lease Agreement was assigned to PCB. (A copy of the Assignment Agreement is attached as "Exhibit C.")

14.     On or about June 19, 2007, LEAF, as Buyer, and PCB, as Seller, executed an Asset Purchase Agreement (the "Purchase Agreement") in which the Lease Agreement was assigned to LEAF. (A copy of the Purchase Agreement is attached as "Exhibit D.")

### COUNT I
### (Breach of the Lease Agreement)

15.     LEAF incorporates the allegations of ¶¶1 through 14, inclusive, as if fully rewritten into this paragraph.

16.     City Realtors has failed to make payments under the Lease Agreement when due and as required.

17.     City Realtors is in default under the Lease Agreement.

18.     LEAF has performed all terms and conditions required of it under the Lease Agreement.

19.     Pursuant to the Lease Agreement, City Realtors owes LEAF the sum of $67,024.78, plus interest at the maximum per annum interest rate permitted by law, plus reasonable collection costs and attorneys' fees.

WHEREFORE, Plaintiff, LEAF Funding, Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, City Realtors in the sum of $67,024.78 plus interest at the maximum per annum interest rate permitted by law, plus reasonable collection costs and attorneys' fees and such other relief as this Court deems just and appropriate in the circumstances, including court costs.

### COUNT II
### (Liability on Sakowski Guaranty)

20.     LEAF incorporates the allegations of ¶¶1 through 19, inclusive, as if fully rewritten into this paragraph.

21.     Sakowski owes LEAF, under the Sakowski Guaranty, the sum of $67,024.78, plus interest at the maximum per annum interest rate permitted by law, plus reasonable collection costs and attorneys' fees.

WHEREFORE, Plaintiff, LEAF Funding, Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, Sakowski in the sum of $67,024.78 plus interest at the maximum per annum interest rate permitted by law, plus reasonable collection costs and attorneys' fees and such other relief as this Court deems just and appropriate in the circumstances, including court costs.

### COUNT III
### (Liability on Lata Guaranty)

22.     LEAF incorporates the allegations of ¶¶1 through 21, inclusive, as if fully rewritten into this paragraph.

23.    Lata owes LEAF, under the Lata Guaranty, the sum of $67,024.78, plus interest at the maximum per annum interest rate permitted by law, plus reasonable collection costs and attorneys' fees.

WHEREFORE, Plaintiff, LEAF Funding, Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, Lata in the sum of $67,024.78 plus interest at the maximum per annum interest rate permitted by law, plus reasonable collection costs and attorneys' fees and such other relief as this Court deems just and appropriate in the circumstances, including court costs.

### COUNT IV
### (Repossession of the Equipment)

24.    LEAF incorporates the allegations of ¶¶1 through 23, inclusive, as if fully rewritten into this paragraph.

25.    The Equipment is described in Schedule A of the Lease Agreement, attached as "Exhibit A."

26.    The value of the Equipment is $45,000.

27.    Pursuant to the Lease Agreement, LEAF is entitled to immediate possession of the Equipment upon default by City Realtors.

28.    LEAF has demanded return of the Equipment.

29.    City Realtors has failed to return the Equipment and is wrongfully retaining possession of the Equipment.

30.    Upon information and belief, the Equipment is located at City Realtors' principal place of business in Chicago, Illinois.

31.    The Equipment has not been taken for tax assessment or fine pursuant to statute or seized under an execution of judgment.

WHEREFORE, Plaintiff, LEAF Funding, Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, City Realtors and enter an order to the effect that LEAF is entitled to immediate possession of the Equipment as well as an Order of possession, directing City Realtors to deliver the Equipment to LEAF, with or without the aid of a sheriff or other appropriate law enforcement authorities and such other relief as this Court deems just and appropriate in the circumstances, including court costs.

**COUNT V**
**(Conversion of the Equipment)**

32.     LEAF incorporates the allegations of ¶¶1 through 31, inclusive, as if fully rewritten into this paragraph.

33.     City Realtors is in possession of the Equipment.

34.     City Realtors has failed to and refused to return the Equipment and is wrongfully retaining possession of that Equipment.

35.     By refusing to return the Equipment, City Realtors has converted it.

36.     The value of the Equipment is $45,000.

WHEREFORE, Plaintiff, LEAF Funding, Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, City Realtors for compensatory and punitive damages, plus interest, together with attorneys' fees and such other relief as this Court deems just and appropriate in the circumstances, including court costs.

Respectfully submitted,

Michael H. McColl, ARDC 6225588
Foran Glennon Palandech & Ponzi PC
150 South Wacker Drive
Suite 1100
Chicago, IL 60606
(312)863-5000

Attorney for Plaintiff LEAF Funding Inc

BEST SCAN          BEST EDGE

**EXHIBIT A**

| **Five Point Capital, Inc. (Lessor)**<br>10525 Vista Sorrento Parkway, #304<br>San Diego, CA 92121 | (888) 576-4685<br>Fax (888)462-4305<br>email info@fivepointcapital.com | LEASE AGREEMENT<br><br>Lease No. 120455 |
|---|---|---|

| Full Legal Name and Address of Lessee | | Name and Address of Equipment Supplier |
|---|---|---|
| City Realtors, Inc. dba REMAX City Realtors<br>6900 West Belmont<br>Chicago, IL 60634 | | SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF. |

| Lessee Phone Number | Lessee Tax ID | Equipment Supplier Phone Number |
|---|---|---|
| (773) 205-5100 | | SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF. |

Equipment Description

See Exhibit "A" attached hereto and made a part hereof.

| Monthly Rent<br>(Plus applicable taxes)<br>$1,763.81 | Base Term in Months<br>60 | Deposit<br>$4,077.62 | Deposit Applied To<br>First and Last Monthly Rentals: $3,527.62<br>Documentation Fee: $550.00 |
|---|---|---|---|

| Equipment Location (if other than billing address of lessee) | City | State | Zip |
|---|---|---|---|
| 1555 North Kinkbury Street 2nd Floor | Chicago | IL | 60630 |

Please read your copy of this Lease Agreement and any schedules attached (Lease) carefully and feel free to ask us any questions you may have about it. We have written the Lease in plain language because we want you to fully understand its terms.   For purposes of this Lease, you and your shall mean the Lessee indicated above, and we, us and our refer to the Lessor, Five Point Capital, Inc., its agents and employees and its successors and assigns.

The undersigned agrees that this lease reflects the agreement of the parties, including all terms of the second page.

| AGREED: Lessee | AGREED: Lessor |
|---|---|
| Legal Name: City Realtors, Inc. dba REMAX City Realtors | FIVE POINT CAPITAL, INC. |
| By: _____ | By: _____ |
| Name: Mariusz Lata | Name: _____ |
| Title: President | Title: Funding Coordinator |
| Date: 1/25/2006 | Date: 2/27/06 |

LEASE GUARANTY For purposes of this Guaranty, Lease shall mean the Lease set forth above and on the second page. I/WE/MY shall mean the person making the guaranty and if married, his or her marital community. YOU/YOUR shall mean the Lessor. I agree that I have an interest in the Lease, economic or otherwise, and that you would not enter into this Lease without this guaranty. I unconditionally guaranty that Lessee will fully and promptly pay all its Obligations under the Lease and any future leases with you when they are due and well perform all its other Obligations under the Lease even if you modify or renew the Lease, or if any payments made by the Lessee are rescinded or returned upon the insolvency, bankruptcy or reorganization of the Lessee, as if the payment had not been made. You do not have to notify me if the Lessee is in default under the Lease. You may obtain and/or report any information from credit reporting agencies you deem necessary to enforce this guaranty. If the Lessee defaults, I will immediately pay in accordance with the default provisions of the Lease all Obligations due under the Lease. I agree that I will not be released or discharged if you (i) fail to perfect a security interest in any property which secures the Obligations of Lessee or mine to you (Collateral); (ii) fail to protect the Collateral; or (iii) abandon, impair or release the Collateral. I agree that you do not have to proceed first against the Lessee or any Collateral. I hereby waive all acceptances of this guaranty and of all other notices or demands of any kind which I may be entitled to except for demand for payment. I will reimburse you for all expenses you incur in enforcing your rights against the Lessee or me, including, without limitation, attorneys' fees and costs. I acknowledge that I have read and understood the Lease and this Guaranty. This is an irrevocable, continuing guaranty and binds my heirs, administrators and representatives. I CONSENT TO THE JURISDICTION OF THE COURTS OF SAN DIEGO COUNTY, CALIFORNIA AND/OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA, AT YOUR SOLE OPTION, FOR THE DETERMINATION OF ALL DISPUTES ARISING UNDER THE LEASE AND THIS GUARANTY. I ALSO CONSENT TO THE JURISDICTION OF THE COURTS LOCATED IN ANY STATE IN WHICH ANY ASSIGNEE OF YOURS HAS ITS PRINCIPAL PLACE OF BUSINESS. However, I agree that you will have the right to commence any action in any Court having the proper jurisdiction for that action, and I agree that this guaranty shall be governed by the laws of the State of California. If this Guaranty is signed by more than one person, the liability shall be joint and several. WE EACH WAIVE TRIAL BY JURY.

| Signature: _____ | Signature: _____ |
|---|---|
| Name: Mariusz Lata | Name: Henry Sakowski |
| Date: 1/25/2006 | Date: |

1.  LEASE: You agree to lease from us and we agree to lease to you, the equipment listed above or on any schedule to this Lease (Equipment). You unconditionally promise to pay us the sum of all of the rental and other payments indicated above or on any schedule (Rent). You authorize us to insert in this lease any serial numbers and other identification data about the Equipment, as well as any other omitted factual matters.  All Rent and other payments under this Lease or any other agreement with us (collectively Obligation or Obligations) are payable in U.S. dollars, and may be adjusted upward or downward no more than ten percent (10%) to reflect actual costs.  This Lease shall not be binding or enforceable until signed by us.

2.  TERM OF LEASE: This Lease shall commence upon our written acceptance and shall end upon your full performance of each and every term, condition and covenant set forth in this Lease and any schedules and extensions.  Rental payments shall be in the amounts and frequency set forth on the face of this Lease and/or any schedules.  In addition to regular rentals, you shall pay to us Interim rent for the use of the Equipment prior to the due date of the first payment.  Interim rent shall be an amount equal to 1/30th of the monthly rental, multiplied by the number of days between the date on which the Equipment is accepted by you and the commencement date of this Lease, together with the number of days between commencement of the Lease and the due date of the first payment.  Interim rent shall be due and payable upon your receipt of our invoice.  The rental period under this Lease shall terminate following the last day of the Base Term above unless it has been extended or otherwise modified.  YOUR OBLIGATION TO PAY RENT TO US IS UNCONDITIONAL AND NOT SUBJECT TO ANY REDUCTION, SET-OFF, DEFENSE, OR COUNTERCLAIM AND MAY NOT BE CANCELED FOR ANY REASON WHATSOEVER.  In the event this Lease is not fully completed for any reason beyond our control, all deposits made by you will be retained as compensation for documentation, processing and other expenses.  We have the right, but not the obligation, to electronically withdraw funds from your bank account to pay for any unpaid Rent, taxes, fees, charges and assessments.  You will provide us with any bank account information we request in order to process electronic payments.  You may revoke our authorization to electronically withdraw funds by giving us ten (10) days prior written notice.

3.  NO WARRANTIES; NO AGENCY:  WE ARE LEASING THE EQUIPMENT TO YOU AS IS, WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR ORDINARY USE IN CONNECTION WITH THIS LEASE.  You understand and agree that we are independent from the vendor, manufacturer and/or supplier (Supplier) of the Equipment and that neither the Supplier nor any other person is our agent, nor are they authorized to waive or change any term or condition of this Lease.  You agree that no representation, guaranty or warranty by the Supplier or other person is binding on us. So long as you are not in default under any of the terms of this Lease, we transfer to you any warranties made to us, as the owner of the

Equipment, by the Supplier. You agree that any breach by the Supplier will not relieve or excuse your Obligations to us.  Regardless of cause, you will not assert any claim whatsoever against us for loss of profits you expended to make or any other direct, consequential, special or indirect damages.  If you have entered into a maintenance agreement for the Equipment and the cost of the maintenance is included in the Rent, you acknowledge that we are not responsible for any service, repairs, or maintenance of the Equipment, and that we are not a party to the maintenance agreement.  If you have a dispute regarding maintenance or service, then you will nevertheless continue to pay all Obligations as they become due.

4.  UCC-ARTICLE-2A:  You agree that this Lease is a "Finance Lease" under Article 2A of the Uniform Commercial Code as adopted by the State of California (UCC).  You acknowledge that:  (a) we did not select, manufacture or supply the Equipment, but at your request we have purchased the Equipment for lease to you; and (b) based solely on your own judgment, you have selected the Supplier and the Equipment that you are leasing from us.  You agree that you have approved any purchase or supply contract between us and the Supplier before signing this Lease; or, if you have entered into a purchase contract for the Equipment, you agree to assign it to us effective when we pay for the Equipment.  You may have rights under the supply or purchase contract, and you may contact the Supplier for a description of those rights or any warranties. To the extent permitted by applicable law, YOU WAIVE ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON YOU UNDER UCC §§ 2A-303 AND 2A-508 THROUGH 2A-522, INCLUDING WITHOUT LIMITATION, THE RIGHT TO: (i) REPUDIATE THE LEASE AND REJECT THE EQUIPMENT; (ii) REVOKE ACCEPTANCE OF THE LEASE; OR (iii) RECOVER DAMAGES FROM US FOR ANY BREACH OF WARRANTY.

5.  DELIVERY OF EQUIPMENT: You agree to accept the Equipment when it is delivered and to sign the Equipment Acceptance supplied by us.  We may at our discretion confirm by telephone that you have accepted the Equipment and this telephone verification of your acceptance of the Equipment shall have the same effect as a signed Equipment Acceptance.

6.  ASSIGNMENT: You may not sell, transfer, assign or sublease the Equipment without our prior written approval.  We may sell, assign or transfer this Lease, or any part of it, and/or ownership of the Equipment without notifying you; and you agree that if we do, the new Lessor will have the same rights and benefits that we now have, and will not have to perform any of our obligations.  You agree that the rights of the new Lessor will not be subject to any claims, defenses or setoffs that you may have against us.  However, any such assignment, sale, or transfer of this Lease or the Equipment will not relieve us of our obligations to you under this Lease.

7.  OWNERSHIP, RIGHTS, AND QUIET ENJOYMENT:  You agree that we are the owner of and have title to the Equipment. You agree, at your expense, to protect and defend our title and other rights to the Equipment.  Further, you agree that you will at all times keep the Equipment free from legal process and liens and you shall

BEST EDGE　　BEST SCAN

give us immediate notice if any legal process or lien is asserted or made against you or the Equipment. You shall have the right to quiet use and enjoyment of the Equipment for the term of this Lease, provided you are not in default. We also have the right, at reasonable times, to inspect the equipment at your expense.

8. CARE, USE AND LOCATION, LOSS OF EQUIPMENT: You are responsible for installing and keeping the Equipment in good working order and repair. You will keep and use the Equipment only at your address shown on this Lease, only for business or commercial purposes and in compliance with all applicable laws, ordinances or regulations. You will not make any alterations to the Equipment without our prior written consent, nor will you permanently attach the Equipment to any real estate. You are responsible for protecting the Equipment from damage, and from any other kind of loss while you have the Equipment or while it is being delivered to you. In the event the Equipment is lost, stolen or damaged, so long as you are not in default under this Lease, then you shall have the option within one week of such event to: (a) repair or replace the Equipment or (b) pay to us the unpaid balance of the remaining Rent under this Lease and our residual interest in the Equipment, discounted to present value at the rate of five percent (5%) plus any other Obligations.

9. TAXES AND FEES: You agree to pay when due all taxes, fees, fines, assessments and penalties relating to this Lease, including, without limitation, documentation fees, filing fees, credit fees, equipment inspection fees, early termination or assumption fees, title fees, name change fees, sales or property taxes, use taxes and business taxes. You also agree that we may estimate the yearly personal property taxes that will be due for the Equipment, and you agree to pay us the estimated taxes together with a processing fee as invoiced by us. If we pay any taxes, fines or penalties for you, you agree to reimburse us, together with a processing fee, on demand.

10. INDEMNITY: We are not responsible for any injuries or losses to you or any other person or property caused by the installation, operation, maintenance or use of the Equipment. You agree to reimburse us for and defend us against any claims for such losses or injuries, including, without limitation, those arising out of the negligence, tort or strict liability claims. This indemnity shall continue even after the term of this lease has expired.

11. INSURANCE: You agree to keep the Equipment fully insured against loss with us as loss payee in an amount not less than the replacement cost until this Agreement is terminated. You also agree to obtain a general public liability policy from anyone who is acceptable to us and include us as an additional insured on the policy. You agree to provide us certificates or other evidence of insurance acceptable to us before this Agreement begins or we will enroll you in our property damage coverage program and bill you a property damage surcharge as a result of our increased administrative costs and credit risk. As long as you are not in default at the time of loss (including losses resulting from acts of god), the replacement value of the Equipment will be applied against any loss or damage as set forth in paragraph 8. You must be current on all of your Obligations to benefit from this program. NOTHING IN THIS PARAGRAPH WILL RELIEVE YOU OF YOUR RESPONSIBILITY FOR LIABILITY INSURANCE COVERAGE ON THE EQUIPMENT. You grant us and our agents power-of-attorney in your name to apply for insurance benefits and endorse checks received in payment of insurance claims.

12. DEFAULT AND REMEDIES: If you: (A) do not pay any Obligation when due; (B) break any of your promises, representations or covenants under this Lease or under any other agreement with us; (C) become insolvent, assign your assets for the benefit of your creditors; (D) or any guarantor enters (voluntarily or involuntarily) into a bankruptcy proceeding; (E) have made any representations to us with respect to any information provided in connection with this Lease or any other agreement with us that is not truthful at the time it is made or have omitted any material information with respect to your assets or liabilities, or any other information that would be considered material in the extension of credit; (F) any guarantor dies; or (G) you change your name, state of incorporation, chief executive office and/or place of residence without providing us with 30 days prior written notice of such change, you will be in default. In the event of a default by you, we can require that you return the Equipment to us and pay to us the remaining balance of all of the Rent due under this Lease, discounted to present value at five percent (5%), together with any other amounts due under this Lease. We can also require that you pay to us our residual interest in the Equipment. Interest shall accrue on all Obligations due us from the date of default until paid at the rate of eighteen percent (18%) per annum, but only to the extent permitted by law. We shall also be entitled to recover from you all damages caused by that default, including any of our income tax benefits. We can also use any of the remedies available to us under the UCC or any other law, including repossession of the Equipment or other Collateral. You agree to reimburse us for all charges, costs, expenses and attorneys' fees that we have to pay to enforce this Lease or collect the Obligations under this Lease and in any lawsuit or other legal proceeding which we are required to bring or defend because of your default. You also agree that in the event of a dispute related to or arising out of this Lease, the Lessor shall be entitled to recover its reasonable attorney's fees and costs. If we have to take possession of the Equipment, you agree to pay the cost of repossession, storing, shipping, repairing and selling the Equipment. You agree that we do not have to notify you that we are selling the Equipment. You also agree that we are entitled to abandon the Equipment if we reasonably believe it to be in our best interests. Any remedies shall be exclusive of any other remedy provided by law or equity.

13. OTHER RIGHTS: Time is of the essence in this Lease. You agree that any delay or failure by us to enforce our rights under this lease or any other agreements shall not prevent us from enforcing any rights at a later time. Both parties intend this Lease to be a valid and legal document, and agree that if any part is determined to be unenforceable, all other parts will remain in full force and effect. You also grant us a security interest in the Equipment and any accessions and attachments to the Equipment as security for your Obligations. You agree that we may obtain and/or report information from or to credit reporting agencies at any time. You agree that, at your expense, we may file financing statements or other related filings in our name or in the name of any agent designated by us in a separate agreement entered into by us without your consent or notice to you. You hereby authorize us, or our assigns, to file a financing statement without your signature, in form and content and from time to time as we deem proper, listing you as Lessee or Debtor. You appoint us or our designee as your attorney-in-fact to execute and file, on your behalf, financing statements covering the equipment or any other collateral. Any notice required by this Lease or the UCC shall be deemed to be delivered when a record properly

directed to the intended recipient has been (a) deposited with the US Postal Service, (b) transmitted by facsimile, (c) transmitted through the Internet, or (d) has been personally delivered.

14. LESSEE REPRESENTATIONS AND WARRANTIES: You hereby represent and warrant that at the time you sign this Lease you are and shall remain a business entity duly organized, validly existing, and in good standing under the laws of the state of your organization, duly qualified to conduct business in every jurisdiction where you conduct business and are not subject to any bankruptcy proceeding and that your exact legal name, state of incorporation, location of your chief executive office and/or your place of residence as applicable, have been correctly identified to us. You further represent and warrant that at the time you sign this Lease the person executing the Lease or any related document on behalf of you or any related guarantor shall be authorized to take such action and bind you and the guarantor to the Lease, and that the execution, delivery and performance of this Lease is duly authorized by your organizational documents and, if necessary, resolutions of your directors and/or shareholders, partners, or managers and/or members. You represent that all financial and other information furnished to us was, at the time of delivery, true and correct. During the term of this Lease, you shall provide us with such interim or annual financial statements as we request.

15. RETURN OF EQUIPMENT; RENEWAL: If no default exists or has occurred under this Lease, you may, at the end of the Base Term or any renewal term, purchase all (but not less than all) of the Equipment for its Fair Market Value. Unless there has been a separate purchase option or buyout agreement attached to this Lease, then at least 120 days prior to the end of the Base Term you must give us written notice via certified mail that you will purchase the Equipment or that you will return the Equipment to us, postage and insurance to be paid by you. If you do not give us such written notice or if you do not purchase or deliver the Equipment in accordance with the terms and conditions of this Lease, then this Lease shall automatically renew for a 12 month term, and thereafter renew for successive 3 month terms until you deliver the Equipment to us. During such renewal(s), the Rent shall be the highest monthly rate set forth in this Lease. We may cancel the renewal by sending you written notice 90 days prior to such renewal term. We will use our reasonable judgment to determine the Equipment's Fair Market Value. Any End of Term option may become null and void at our discretion if any Event of Default occurs or continues at any time during the term of the Lease. Upon payment of End of Term option price, and if no default exists, we shall transfer our interest in the Equipment to you "AS IS, WHERE IS" without any representation or warranty whatsoever and this Lease will terminate. Provided you have given the required notice, and are not then in default, you shall return the Equipment, freight and insurance prepaid, to us in good repair, condition, and working order, drayage and wear and tear excepted, in a manner and to a location designated by us.

16. LATE CHARGE; FEES: If any part of any Obligation is not made by you within three (3) days of its due date, you agree to pay us a late fee of up to fifteen percent (15%) of each such late payment (to the extent permitted by law). You agree to pay us the late fee not later than one month following the date that the Obligation was first due. You agree to reimburse us for our reasonable expenses incurred in connection with this Lease, including, but not limited to, a documentation fee based on our current fee schedule which is available to you upon your request.

17. ENTIRE AGREEMENT; CHANGES: This Lease contains the entire agreement between you and us, and it may not be altered, amended, modified, terminated or otherwise changed except in writing and signed by both you and us. A limiting endorsement on a check or other form of payment will not be effective to modify the Obligations or any of the other terms and conditions of this Lease, and we may apply any payment received without being bound by such limiting endorsements.

18. COMPLIANCE; NOTICES: In the event you fail to comply with any terms of this Lease, we can, but we do not have to, take any action necessary to effect your compliance upon ten (10) days prior written notice to you. If we are required to pay any amount to obtain your compliance, the amount we pay plus all of our expenses in causing your compliance, shall become additional Obligations and shall be paid by you together with the next due Rent payment. If any notices are required under this Lease, they shall be sufficient if given personally or mailed to the address set forth in this Lease by certified or registered mail, postage prepaid. This Lease is for the benefit of and is binding upon you and your personal representatives, successors and assigns.

19. CHOICE OF LAW; JURISDICTION: YOU AND WE AGREE THAT THIS LEASE SHALL BE BINDING WHEN ACCEPTED IN WRITING BY US AT OUR OFFICES AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA OR THE LAWS OF THE STATE IN WHICH ANY ASSIGNEE HAS ITS PRINCIPAL PLACE OF BUSINESS. YOU AND WE EACH CONSENT TO THE JURISDICTION OF THE COURTS LOCATED IN SAN DIEGO COUNTY, CALIFORNIA, AT OUR SOLE OPTION, FOR THE DETERMINATION OF ALL DISPUTES ARISING UNDER THIS LEASE. YOU ALSO CONSENT TO THE JURISDICTION OF THE COURTS IN ANY STATE IN WHICH OUR ASSIGNEE HAS ITS PRINCIPAL PLACE OF BUSINESS. However, you agree that we will have the right to commence any action in any Court having the proper jurisdiction for that action. You agree and consent that we may serve legal papers on you by registered or certified mail, which shall be sufficient to obtain jurisdiction. WE EACH WAIVE TRIAL BY JURY IN ANY ACTION BETWEEN US.

20. FACSIMILE SIGNATURES: We each agree that facsimile signatures on this Lease and any related documents shall be as binding and enforceable as original signatures, and such signatures shall be deemed original signatures for any and all purposes.

21. SECURITY DEPOSIT: Any security deposit is payable upon execution and is non-interest bearing and is to secure your performance under this Lease. Any security deposit made may be applied to satisfy any of your Obligations, in which event you will promptly restore the security deposit to its full amount. If all conditions herein are fully satisfied and provided you have never been in default as set forth in paragraph 12, the security deposit will be refunded to you after the return of the Equipment pursuant to paragraph 15.

LA#:　120455　　　　Initial _____

*BEST EDGE*

*BEST SCAN*

## EQUIPMENT EXHIBIT "A"

This Exhibit "A" is to be attached to and become part of Lease Agreement # __120455__ dated __1/25/2006__ by and between the undersigned and Five Point Capital, Inc. (Lessor).

**Vendor:**
Thomas Interior Systems, Inc.
476 Brighton Drive
Bloomingdale, IL 60108
630-980-4200

**Equipment:**

| | | | |
|---|---|---|---|
| 1 | Ethospace System | 9 | @Dr Frame, W/Dr R Swing 36W |
| | Which Includes: | 1 | @Dr Frame, W/Dr L Swing 36W |
| 10 | +Tall Pole, Nonpwr, Chicago | 1 | @Dr Frame, W/Dr R Swing 42W |
| 4 | +In-Line Pole 60H | 1 | @Dr Frame, W/Dr L Swing 42W |
| 22 | +Short Pole, Nonpower, w/cutouts 60H | 12 | +Dr Lever Handle, Lock Set/Std Bevel |
| 4 | +Truss, Fixed, Nonpwr 96L | 1 | +Frame, Stacking 16H 42W |
| 30 | +Arms, Supp (1pr) 48L | 8 | +Frame, Stacking 16H 48W |
| 15 | +Box/Cover, Recept 6/Pkg | 11 | +Draw Rod 38H |
| 15 | +Cable Cover 3/Pkg | 1 | +Wall Start 38H |
| 8 | +Screen, Boundary 60 Uppr Supp Arm Ht, 48W | 3 | +Fin End, Std 38H |
| | | 24 | +Draw Rod 86H |
| 22 | +Screen, Boundary 60 Uppr Supp Arm Ht, 48W | 4 | +Wall Start 86H |
| | | 1 | +Conn, 2-Way 90 Vinyl, Npwr 86H |
| 28 | +Wk Surf, Boomerang, Formcoat 48W | 10 | +Conn, 3-Way 90 Std Vinyl, Npwr 86H |
| 28 | +Pole Shelf, Formcoat 9D | 5 | +Spacer Vinyl, Npwr 86H |
| 28 | +File Bin, Mobile | 17 | +Chg of Ht Fin End Std 32H |
| 28 | +Tray Set, Swivel, Wk Surf Underside Att | 10 | +Draw Rod 70H |
| 6 | +Signage 6/Pkg | 2 | +Conn, 2-Way 90 Vinyl, Npwr 70H |
| 6 | +Coat Hook 6/Pkg | 7 | +Conn, 3-Way 90 Vinyl, Npwr 70H |
| 28 | +Task Light, Fluorescent, for Resolve | 2 | +Conn, 2-Way 90 Stacking |
| 9 | +Frame, Npwr Access Holes 38H 36W | 7 | +Conn, 3-Way 90 Stacking |
| 7 | +Frame, Npwr Access Holes 38H 36W | 9 | +Hrdwr Kit, Stkng Frm, Chg Ht, Frm to Frm or |
| 2 | +Frame, Npwr No Access 38H 18W | | 2-Way 90-/135-Dgr |
| 1 | +Frame, Npwr Access Holes 38H 24W | 2 | +Conn cover, 2-way 90 Deg Vinyl, Radius |
| 1 | +Frame, Npwr Access Holes 38H 42W | | 86H |
| 10 | +Frame, Npwr Access Holes 86H 30W | 7 | +Conn, 3-Way 90 Std Vinyl, Npwr 86H |
| 9 | +Frame, Npwr Access Holes 86H 36W | 3 | +Draw Rod 54H |
| 1 | +Frame, Npwr Access Holes 86H 42W | 1 | +Fin End, Std 54H |
| 11 | +Frame, Npwr Access Holes 86H 48W | 40 | +Tile, Glazed Window Mid/Bot 16H 48W |
| 1 | +Frame, Npwr Access Holes 70 H 42W | 40 | +Tile, Glazed Window Top 16H 48W |
| 8 | +Frame, Npwr Access Holes 70 H 48W | 4 | +Tile Glazed Window Top 16H 42W |
| 2 | +Frame, Npwr Access Holes 54H 30W | 18 | +Tile Glazed Window Top 16H 36W |
| 1 | +Frame, Npwr Access Holes 54H 48W | | |

**Lessee:** ___City Realtors, Inc. dba REMAX City Realtors___

**Signature:** _____

**Title:** ___President___

FROM                                    (FRI)FEB 24 2006  4:14/ST. 4:14/No. 6837820011 P  2
02/24/2006 13:26 FAX  858 866 0891      FIVE POINT CAPITAL, INC                    ☒002/002

BEST SCAN

BEST EDGE

## ADDENDUM

### TO

### LEASE AGREEMENT NO. 120455

Reference is made to the above-referenced Lease Agreement ("Lease") dated 1/25/2006, by and between City Realtors, Inc. dba REMAX City Realtors as Lessee, and FIVE POINT CAPITAL, INC. as Lessor.

Notwithstanding the terms and conditions contained in the Lease and to the limited extent hereof, Lessor and Lessee agree as follows:

The "Monthly Rent (Plus Applicable Taxes)" as stated on all Lease documents is hereby changed from "$1,763.81" to "$1,922.55", which shall be applied as set forth in the Lease.

The "Deposit" as stated on all Lease documents is hereby changed from "$4,077.62" to "$4,395.10", which shall be applied as set forth in the Lease.

The "Deposit Applied To" as stated on all Lease documents is hereby changed from "First and Last Monthly Rentals: $3,527.62  Documentation Fee: $550.00" to "First and Last Monthly Rentals: $3,845.10  Documentation Fee: $550.00", which shall be applied as set forth in the Lease.

In all other respects, the terms and conditions of the Lease, as originally set forth, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto, by their authorized signatories, have executed this Addendum at the date set forth below their respective signatures.

LESSEE:                                 LESSOR:
City Realtors, Inc. dba REMAX City      FIVE POINT CAPITAL, INC.
Realtors

BY:                                     BY:

NAME:  Mariusz Leta                     NAME:  Amber D Trost

TITLE:  President                       TITLE:  Funding Coordinator

DATE:  02/24/2006                       DATE:  2/24/08

*A facsimile of this agreement with signature shall be considered to be an original.*

JUDGE GETTLEMAN
MAGISTRATE JUDGE COLE
NF

BEST EDGE

| | | | |
|---|---|---|---|
| LESSOR: | FIVE POINT CAPITAL, INC.<br>10525 VISTA SORRENTO PKWY<br>SUITE #304<br>SAN DIEGO, CA 92121<br>888-576-4685 | LEASE NUMBER | 120455 |
| | | DATE OF LEASE | 1/25/2006 |

LESSEE:    City Realtors, Inc. dba REMAX City Realtors
6900 West Belmont
Chicago, IL 60634
(773) 205-6100

# ACKNOWLEDGEMENT AND ACCEPTANCE
## OF EQUIPMENT BY LESSEE

**SEE EXHIBIT "A" ATTACHED**

Lessee hereby acknowledges that the Equipment described above has been received in good condition and repair, has been properly installed, tested, and inspected, and is operating satisfactorily in all respects for all of Lessee's intended uses and purposes. Lessee hereby accepts unconditionally and irrevocably the Equipment.

By signature below, Lessee specifically authorizes and requests Lessor to make payment to the supplier of the Equipment. Lessee agrees that said Equipment has not been delivered, installed, or accepted on a trial basis.

WITH THE DELIVERY OF THIS DOCUMENT TO LESSOR, LESSEE ACKNOWLEDGES AND AGREES THAT LESSEE'S OBLIGATIONS TO LESSOR BECOME ABSOLUTE AND IRREVOCABLE AND LESSEE SHALL BE FOREVER ESTOPPED FROM DENYING THE TRUTHFULNESS OF THE REPRESENTATIONS MADE IN THIS DOCUMENT.

**DATE OF ACCEPTANCE:**

**LESSEE:** City Realtors, Inc. dba REMAX City Realtors

_____        _____

Mariusz Lata                   President

**IMPORTANT:** THIS DOCUMENT HAS LEGAL AND FINANCIAL CONSEQUENCES TO YOU. DO NOT SIGN THIS DOCUMENT UNTIL YOU HAVE ACTUALLY RECEIVED **ALL** OF THE EQUIPMENT AND ARE COMPLETELY SATISFIED WITH IT.

**I HEREBY AUTHORIZE** _____,
                                      TITLE
**TO ORALLY VERIFY MY/OUR ACCEPTANCE OF THE ABOVE REFERENCED EQUIPMENT IN MY ABSENCE.**

**EXHIBIT**

**B**

**BEST EDGE**

## LEASE ASSIGNMENT AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned ("Assignor") hereby assigns, transfers, and sets over to Santa Barbara Bank & Trust, a division of Pacific Capital Bank, N.A. ("Assignee") all monies now due and that hereafter come due to Assignor under or on account of that/those certain lease agreement(s) as identified herein or per the attached schedule(s), ("the Lease(s)") executed in favor of Assignor by the indicated lessee(s), commencing with the next due monthly rental payment(s), and all of the Assignor's rights and remedies thereunder to receive or collect such monies.

Assignor hereby grants a security interest, pursuant to the California Uniform Commercial Code, to Assignee in the property described in said lease(s) and in all accessories, parts, insurance policies, service or maintenance agreements, and other property ("equipment") now or hereafter affixed thereto or used in connection therewith and all proceeds of any of the foregoing. This security interest shall secure (a) all obligations of Lessee(s) under the Lease(s), (b) all obligations of Assignor to Assignee, however created, direct or contingent (including any guarantees), whether arising in the past, present or hereafter and (c) all costs and expenses incurred in the collection or enforcement of the foregoing.

Assignor warrants and agrees that:

1.       The equipment has been delivered to and accepted by the Lessee as being in good working order, and conforms to the invoices submitted, and will be kept at the address shown in the Lease(s) unless Assignee otherwise consents in writing;

2.       Assignor has full title to the equipment and will at all times keep the equipment free of all liens, taxes, and claims whatsoever other than use of the equipment by Lessee(s) in accordance with the Lease(s) and the security interest hereunder;

3.       The Lease(s) is/are genuine and represent(s) a valid obligation of a bona fide Lessee for the amount stated therein; the Lease and other documents are and will be legally enforceable by Assignee in accordance with its terms except as enforceability may be limited by bankruptcy and other laws affecting creditor's rights generally; the Lease(s) and other documents shall not be subject to any claims, offsets, defenses, or counterclaims; all statements contained therein are true.

4.       The Lease(s) is/are the only Lease(s) or rental agreements(s) concerning the equipment and constitutes the entire agreement between the Assignor and Lessee relating thereto;

5.       There are no purchase or renewal options in or to the Lease(s) or the equipment except as stated in the Lease(s);

6.       There is and has been no default(s) under the Lease(s);

7.       Assignor has caused or will promptly cause any actions or procedures to be accomplished that are permitted or required by statute or regulation to perfect the Assignee's security interest, lien and/or reservation of title, including without limitation the filing of financing statements, recording of documents or obtaining of a certificate of title disclosing the Assignee's interest;

8.       Assignor will not sell, transfer, assign, or otherwise dispose of any of the equipment or any interest therein except with prior written consent of the Assignee;

9.       Assignee may examine and inspect all the equipment, wherever located, at any reasonable time or times. Assignee may from time to time, at its option, perform any agreement of the Assignor hereunder which the Assignor fails to perform and take any other action that Assignee deems necessary for the maintenance or preservation of any of the equipment or its interest therein.

Nonpayment when due, whether by acceleration or otherwise, of any monies, sums or amounts payable under or on account of the Lease(s), shall constitute a default hereunder. Upon such default under any assigned lease, Assignee may exercise from time to time any rights or remedies available to it under such lease, the California Uniform Commercial Code, California Vehicle Code or other statute or contractual agreement. Any proceeds of the equipment will be applied first to the payment of costs and expenses incurred in connection with the taking, storing, marketing and sale of the equipment, including reasonable attorney fees, and then to the rental obligations owed to Assignee. Proceeds of any collateral securing such assigned lease will be similarly applied first to the costs and expenses incurred in enforcing the collateral agreement and then to the rental obligations owed to Assignee. The surplus, if any, and any equipment or other collateral remaining after payment in full of all obligations owed to Assignee, shall revert to Assignor.

In exercising its rights under the Lease(s), any guaranty thereof, collateral assignments or pledges, or under any statute or other agreements, Assignee shall have sole discretion to choose which rights to exercise, in which order, and when. Assignor shall have no right to direct Assignee in this regard and waives any claim or defense which it may have with regard to the manner of timing, including delay, of such exercise of Assignee's rights, including any claim that Assignee's acts or omissions have caused any damage

**EXHIBIT**

**C**

03/14/2006 15:00 FAX  858 462 4305       FIVE POINT CAPITAL       → SBB&T       ☒003/004

BEST SCAN          BEST EDGE

to Assignor or have caused the discharge of any obligor, or the release of property to which Assignor may have otherwise resorted has diminished, destroyed or otherwise adversely affect Assignor.

Until all obligations secured hereby have been paid in full, Assignor shall have no right of subrogation and Assignor further waives any right to enforce any remedy which Assignor now has or later may have against Lessee(s) or any other person(s), now or hereafter assigned to Assignee, and/or security now or later held by Assignee. Upon payment by Lessee(s) of all monetary obligations under the Lease(s), the remaining rights including any interest in the residual value of the equipment, if any, shall revert to Assignor and Assignee shall, without warranty, release its security interest in the collateral.

Assignor warrants and agrees that each of the waivers set forth above are made with Assignor's full knowledge of their significance and consequences with the understanding that events giving rise to any defense waived may diminish, destroy or otherwise adversely affect rights which Assignor otherwise may have against Lessee(s), Assignee or others, or against the equipment or any collateral, and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of the waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective to the maximum extent permitted by law.

If Assignor shall breach any of its warranties, representations or obligations contained herein, or should Assignee discover that Lessee, vendor or Assignor has misrepresented any fact pertaining to a Lease, then Assignor shall promptly, upon Assignee's request, repurchase said Lease. The repurchase price in each case shall be the unpaid balance of the Lease payments, including any accrued charges, plus expenses, if any, for repossession, recovery, storage, court costs, disbursements and attorney's fees in enforcing the Lease(s) or repossessing the equipment, less any applicable refund of unearned finance charges. Repurchased Lease(s) shall be delivered to Assignor without any warranties whatsoever.

Should Assignee retain legal counsel to enforce this Agreement, Assignor shall pay Assignee a sum equal to all its expenses, including reasonable attorney's fees incurred by Assignee whether or not litigation is instituted.

This Agreement shall be deemed to have been made and shall be construed in accordance with the laws of the State of California. Assignor hereby agrees that in the event a suit is brought in any qualified state or federal court located in the State of California, Assignor consents to the jurisdiction of such courts and consents to venue in the County of Santa Barbara, State of California, or at Assignee's option, venue may be in any other county or judicial district appropriate under the applicable Rules of Procedure.

Lease(s) Assigned Hereunder:
        IF MORE THAN ONE LEASE:
as described on Schedule attached hereto and made a part hereof.
Initials: _____.

        IF ONLY ONE LEASE:
| | |
|---|---|
| Lessee: | City Realtors, Inc. dba REMAX City Realtors |
| Date of Lease: | 1/25/2006 |
| Original Lease Term (# of payments): | 60 |
| Payment Amount: | $1,763.81 |
| Remaining # of rental payments assigned: | 56 |
| Residual Amount Assigned (if it is assigned with stream): | $N/A |
| Date Next Due: | 5/01/06 |
| Amount paid to Assignor (NPV of assigned amounts) | $79,971.72 |
| Discount Rate: | 9.25 |
| Percent | |

The undersigned warrants that he/she has full authority to execute this Assignment on behalf of Assignor.

Assignor: Five Point Capital, Inc.

By: _____ Title: Funding Coordinator        Date: 3/14/06

Address: 10525 Vista Sorrento Pkwy. Ste. 304

        San Diego, CA 92121

        LO-23 (12/02)

08CV 3649
JUDGE GETTLEMAN
MAGISTRATE JUDGE COLE

NF

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of June 19, 2007, by and among **LEAF FUNDING, INC.**, a Delaware corporation, **LEAF FINANCIAL CORPORATION**, a Delaware corporation, and **LEAF COMMERCIAL FINANCE CO., LLC**, a Delaware limited liability company (collectively, the "Buyer," and whose obligations hereunder shall be joint and several); and **PACIFIC CAPITAL BANK, N.A.**, a national banking association ("Seller"). Capitalized terms used, but not defined, in this Agreement shall have the meaning ascribed thereto in Appendix A attached hereto.

WHEREAS, Seller, among other business activities, is engaged in the Business;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, certain of the assets of Seller relating to the Business, on the terms set forth herein; and

WHEREAS, Buyer has agreed to assume certain specific liabilities related to such assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Purchase and Sale. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall irrevocably sell, assign, transfer and deliver to Buyer, and Buyer shall purchase, all of Seller's right, title and interest in and to all of the following (collectively, the "Assets"):

(a)    all lease agreements or other contracts for use, conditional sale, loan or financing entered into or acquired by Seller as part of the Business, as a lessor, lender or financier, that, are set forth on Schedule 1(a) (which schedule shall be provided in the form of a read-only computer disc containing a file identifying all such leases, and a separate file identifying the Performing Leases) (each a "Lease" and collectively, the "Leases");

(b)    all right, title and interest that Seller has in the Subject Equipment, collateral, Related Property or Residual Value with respect to each Lease (subject, however, to the possessory rights of lessee therein) and any other collateral that secures the obligation of a lessee under each Lease;

(c)    all Contract Files pertaining to each Lease;

(d)    the rights of Seller with respect to all lease transactions that have been approved, but for which no lease has been finally executed as of the Record Date, as set forth on Schedule 1(d) (which shall be in the form of a read-only computer disc, and need not be updated as of the Closing Date) (the "Backlog");

EXHIBIT

D

(e)   all of Seller's rights under any existing Customer agreement relating to any Leases or the Backlog;

(f)   all of Seller's intangible rights and property associated exclusively with the Business (but excluding anything that is also used in any part of the Seller's business, other than the Business), including but not limited to, all trademarks, patents, copyrights, other intellectual property used exclusively in the Business, going concern value, goodwill, telephone numbers, facsimile numbers, processes, business and product names (if any), trade secrets (if any), industrial models, designs, methodologies, technical information, and know-how relating to the origination and servicing of the Leases, but excluding (i) trade names, logos, slogans, (ii) licenses to software that are not by their terms transferable and (iii) telephone numbers, facsimile numbers and post office boxes other than those listed on Schedule 1(f);

(g)   all rights of Seller in guaranties, collateral accounts, security deposits and other collateral posted by any person in connection with the Leases;

(h)   those items of equipment, furniture, computer hardware and software, leasehold improvements, fixtures and other tangible personal property listed on Schedule 1(h);

(i)   all books, records and other documents and information related to the Business or the Assets, including all Customer, prospect, third party originator and distributor lists, sales literature, price lists, quotes and bids, promotional programs, product catalogs and brochures, inventory records, product data, purchase orders and invoices, sales orders and sales order log books, commission records, Customer information, correspondence (but excluding any such items that relate to the business of Seller other than the Business, and excluding any internal analyses by Seller with respect to its decision to sell the Business) and all personnel records and other records of Seller related to its employees set forth on Schedule 1(i) to the extent their transfer is permitted by law;

(j)   all insurance benefits related to the Leases and the Subject Equipment, including rights and proceeds, arising from or relating to the Assets or Assumed Liabilities prior to the Closing Date, unless expended in accordance with this Agreement; and

(k)   all claims of Seller against third parties relating to the Business or the Assets, whether choate or inchoate, known or unknown, contingent or noncontingent, including equipment warranties and those claims set forth on Schedule 1(k), but excluding any claims for reimbursement of taxes advanced or tax refunds that relate to periods before the Closing and claims relating to Excluded Assets and Retained Liabilities.

Any other assets not set forth in this Section 1 shall remain the property of Seller (the "Excluded Assets").

2.   Assumed Liabilities.  Upon the terms and subject to the conditions set forth herein, Buyer hereby assumes and agrees to pay, perform, discharge or otherwise satisfy in accordance with their respective terms, all of the Assumed Liabilities.  Buyer shall not assume the Retained Liabilities.

3.    Purchase Price. The purchase price of the Assets shall be an amount equal to the sum of (i) 104.7643% of the Net Investment in the Performing Leases, as of the Record Date, which will be reflected on the Closing Date Report, (ii) 104.7643% of the Net Investment in any Leases that are originated between the Record Date and the Closing Date and (iii) accrued interest on the amounts in (i) and (ii), calculated at the weighted average effective yield of the Performing Leases from the Record Date to the date of payment, and (iv) $2,000,000 (the "Purchase Price").

4.    Closing. The Closing will take place at the offices of Seller's counsel at 11355 West Olympic Boulevard, Los Angeles, California, commencing at 10:00 a.m. (local time) on the later of (a) June 22, 2007 or (b) the date that is five (5) Business Days following the termination of the applicable waiting period under the HSR Act, unless Buyer and Seller otherwise agree (the "Closing Date").

5.    Closing Obligations.

(a)    Deliveries by Seller. In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing (unless otherwise specified below, and except to the extent waived by Buyer), Seller shall deliver to Buyer:

(i)    the Closing Date Report, to be delivered at least three business days prior to the Closing Date;

(ii)    a Bill of Sale executed by a duly authorized officer of Seller;

(iii)    an Interim Servicing Agreement executed by a duly authorized officer of Seller;

(iv)    a bailment agreement (the "Bailment Agreement") with respect to the Contract Files, in form acceptable to both parties, executed by a duly authorized officer of Seller;

(v)    a legal opinion of Seller's counsel in form and substance reasonably acceptable to Buyer, in the form attached hereto as Exhibit A;

(vi)    a good standing certificate for Seller, issued by the United States Office of the Comptroller of the Currency, dated not more than thirty (30) days prior to the Closing Date;

(vii)    a certificate of the Secretary of Seller certifying, as complete and accurate as of the Closing Date, attached copies of its Governing Documents and certifying and attaching all requisite resolutions or actions of Seller approving the execution and delivery of the Transaction Documents and the consummation of the Contemplated Transactions and certifying to the incumbency and signatures of the officers of Seller executing each of the Transaction Documents;

(viii)    a certificate executed by Seller as to the accuracy of its representations and warranties as of the date of this Agreement and as of the Closing Date in

3

accordance with Section 6 and as to its compliance with and performance of its covenants and obligations to be performed or complied with on or before the Closing Date in accordance with Section 8; and

(ix)    such other deeds, bills of sale, assignments, certificates of title, other instruments of transfer and conveyance and other documents or certificates as may reasonably be requested by Buyer, each in form and substance satisfactory to Buyer and its legal counsel and executed by a duly authorized officer of Seller.

(b)    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Seller (except to the extent waived by Seller):

(i)    an amount in cash equal to (A) the portion of the Purchase Price described in clauses (i) and (iv) of Section 3(a) and the interest thereon pursuant to clause (iii) of Section 3(a), plus (B) all property taxes on the Leases or Subject Equipment that have been advanced by Seller and not yet collected from the lessees as of the Record Date, less (C) security deposits, and less (D) any booked but undisbursed lease fundings, and less (E) property taxes on the Leases or Subject Equipment that have been received from lessees (or former lessees) as of the Record Date, and not yet remitted, as reflected in a closing schedule, in the form of Schedule 5(b), and less (F) $62,500, in payment of Seller's share of the Hart-Scott-Rodino Act filing fee, as agreed by the parties, which amount shall be payable by wire transfer to the account that is identified by Seller to Buyer at least two (2) Business Days prior to the Closing Date;

(ii)    a certificate of the Secretary of each Buyer certifying, as complete and accurate as of the date hereof, attached copies of the Certificate of Incorporation and Bylaws of such Buyer and certifying and attaching all requisite resolutions or actions of such Buyer's boards of directors approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder and certifying to the incumbency and signatures of the officers of such Buyer executing this Agreement and any other document required to be delivered by such Buyer hereunder;

(iii)    a duly executed copy of the Interim Servicing Agreement;

(iv)    the Bailment Agreement, executed by a duly authorized officer of Buyer;

(v)    a good standing certificate for each Buyer, issued by the state in which each Buyer is incorporated, dated not more than thirty (30) days prior to the Closing Date; and

(vi)    such other documents and instruments as may reasonably be requested by Seller, each in form and substance satisfactory to Seller and its legal counsel and executed by a duly authorized officer of Buyer.

(c)    Post-Closing Payments.  In addition, if and to the extent that any Leases are originated between the Record Date and the Closing Date, then no later than fifteen (15) days after the Closing Date, Buyer shall pay to Seller an amount in cash equal to the portion of the

Purchase Price described in clause (ii) of Section 3(a) and the interest thereon pursuant to clause (iii) of Section 3(a).

     6.    Representations and Warranties of Seller. Seller makes the representations and warranties to Buyer set forth in this Section 6. Except as set forth in the next sentence, these representations and warranties are true and correct as of the date hereof and shall be true and correct as of the Closing Date. Notwithstanding the foregoing, representations and warranties with respect to the Leases are true and correct as of the date hereof and shall be true and correct as of (i) the Record Date and (ii) except for such changes as shall be set forth in amended Schedules to this Agreement (which will be delivered to the Buyer not later than three (3) Business Days following the Closing Date) and which will not in the aggregate materially adversely affect the Assets as a whole or the financial condition, results of operation or business of the Business, as of the Closing Date.

     (a)    Organization. Seller is a national banking association duly organized, validly existing and in good standing under the laws of the United States, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the Leases. Seller is not required to be qualified to do business as a foreign corporation under the laws of any state or other jurisdiction in order to conduct its business.

     (b)    Authority. Seller has taken all action necessary to approve the Transaction Documents and the transactions contemplated thereby. Seller has all requisite corporate power and authority and has taken all action necessary in order to execute, deliver and perform its obligations under the Transaction Documents. This Agreement has been duly authorized, executed and delivered and, prior to the Closing, the other Transaction Documents will have been, duly authorized and at Closing will be duly executed and delivered by Seller and, assuming due execution and delivery by Buyer, constitute or (with respect to the Transaction Documents other than this Agreement) will at Closing constitute, the legal, valid and binding obligations of Seller, enforceable in accordance their terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting creditors' rights generally.

     (c)    No Conflict. Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated in the Transaction Documents will, directly or indirectly (with or without notice or lapse of time):

     (i)    breach (A) any provision of any of the Governing Documents of Seller or (B) any resolution adopted by the board of directors or the shareholders of Seller;

     (ii)    give any Governmental Authority or other Person the right to prevent any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any Legal Requirement or any order of any Governmental Authority to which Seller, or any of the Assets, may be subject;

     (iii)    contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by Seller or that otherwise relates to the Assets or to the Business, it being understood that no representation

is being made as to the licensing requirements that may apply to Buyer as owner and operator of the Business after the Closing;

        (iv)    breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Lease or any of the Backlog; or

        (v)    result in the imposition or creation of any Lien upon or with respect to any of the Assets, other than such equitable Lien as may run in favor of Buyer as a result of this Agreement.

        (d)    <u>Title</u>.  Seller owns good and transferable title to all of the Assets free and clear of any Liens other than those described on <u>Schedule 6(d)</u>.  Seller warrants to Buyer that, at the time of Closing, all Assets shall be free and clear of all Liens, other than, in the case of Subject Equipment, the Lien of the Leases themselves, and also subject to those other Liens described on <u>Schedule 6(d)</u>.

        (e)    <u>Financial Information</u>.  The Closing Date Report will be in accordance with Seller's records and will accurately present the net book value of the Leases as of the Record Date.  In preparing the Closing Date Report, Seller will not change its accounting practices or methodologies from those used in the preparation of any previous reports provided to Buyer.  Since May 1, 2007, there has been no material adverse change to the Assets or the Business as a whole, or the financial conditions or operations of the Business, except (a) as of the date hereof, as set forth on <u>Schedule 6(e)</u>, and (b) as of the Closing Date, as set forth on an updated <u>Schedule 6(e)</u> delivered at the Closing.

        (f)    <u>Taxes</u>.  Other than as set forth on <u>Schedule 6(f)</u>, Seller has filed all United States federal income tax returns and all other tax returns (including, but not limited to, profits, premium, estimated, excise, sales, use, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment, and property taxes) which are required as of the date hereof to be filed by them, or otherwise obtained appropriate extensions to file, and has paid all Taxes due pursuant to such returns or pursuant to any assessment received by Seller, except such Taxes that are (i) being contested in good faith by appropriate proceedings and (ii) are set forth on <u>Schedule 6(f)</u> attached hereto.  Seller will file all such tax returns when due, and pay all Taxes due pursuant to such returns, for all periods that include the date hereof.  No Tax lien has been filed and, to the knowledge of Seller, no claim is being asserted with respect to any such Tax, fee or other charge.

        (g)    <u>Approvals</u>.  Other than as set forth on <u>Schedule 6(g)</u>, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any other Person are necessary for the execution, delivery or performance by Seller of the Transaction Documents or for the validity or enforceability hereof or thereof.

        (h)    <u>Leases</u>.

        (i)    No Performing Lease as of the date hereof is, nor as of the Record Date will be a Past Due Lease, a Suspended Lease, or a Lease that is subject to any pending repossession action or as to which Seller has received a notice of an event that is, or with notice

and/or lapse of time is likely to constitute, a material default or of any claim by a lessee or guarantor of a right of offset or counterclaim (as referenced in Section 6(h)(x) and identified on Schedule 6(h)(x)).

(ii)    Each Lease (other than a Charged-Off Lease) is evidenced by a written agreement, and there are no material understandings, agreements, undertakings or arrangements between any of Seller and the lessees or transferees under any Lease which are not set forth therein or in a written agreement included in the Contract File relating to such Lease. The entries made on Seller's system and on the Closing Date Report with respect to each Lease (other than a Charged-Off Lease) are consistent with the Contract Files relating thereto. Each such Lease and any Contract Files pertaining thereto shall be supplied by Seller to Buyer as promptly as possible but in any event at the Closing Date.

(iii)    No payments required to be made under any Lease have been paid in advance of the due dates thereof except for payments reflected in the amount of the related Lease receivable as shown in the Records.

(iv)    Seller has not acted, or failed to act, in a manner which would materially alter or reduce any of its rights or benefits under any manufacturers' or vendors' warranties or guarantees relating to property covered by any Performing Lease.

(v)    Seller has properly prepared and filed Financing Statements for each Lease (other than a Charged-Off Lease) that was over $25,000 at the time of origination, and each such Financing Statement is current.

(vi)    Each Lease (and any related guarantees) is and will continue to be after the date hereof a valid, binding and enforceable, non-cancelable obligation of the lessee thereunder (and guarantors thereof, if any) in accordance with its terms, except as the same may be affected by bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally. Each of such lessees and any guarantor is a bona fide party thereto and, to the knowledge of Seller, had the requisite legal capacity to enter into the respective agreements to which it is a party as of the time it entered into those agreements.

(vii)    The property that is the subject of each Performing Lease has been delivered to the lessee thereunder, and accepted by such lessee.

(viii)    Seller has absolute, complete and indefeasible title to the property subject to each Performing Lease (or a duly perfected first-lien security interest in the property subject to such Performing Lease) and all sums due thereunder, free and clear of any and all Liens or claims of any Person (other than the lessee under the Performing Lease itself). The supplier or vendor of said property has received payment in full for said property.

(ix)    Seller is not in material breach of any obligation under any of the Performing Leases.

(x)    Other than as set forth on Schedule 6(h)(x), Seller has received no notice of any event which is, or with notice and/or lapse of time is likely to constitute, a material

7

default under any Performing Lease or of any claim by a lessee or guarantor of a right of offset or counterclaim.

(xi)     None of the Performing Leases is a Past Due Lease or has a lessee who is or has been subject to an Insolvency Event. No Performing Lease that would otherwise be a Past Due Lease has been restructured, and no agreements to defer, or change the schedule of, any payments due under any Performing Lease have been made within such time period.

(xii)     Each Performing Lease has a corresponding Contract File, and each Contract File includes proof of payment (either by copies of canceled checks or confirmations of wire transfers or by such other evidence, all as shall be satisfactory to Buyer in its sole discretion) for the Subject Equipment underlying each Performing Lease.

(xiii)     The descriptions of each Performing Lease set forth on Schedule 1(a) are, and on the Closing Date Report will be, properly coded with respect to each of the following items of data: (a) the number of payments remaining, (b) the periodic payment amount, (c) the security deposit amount, (d) the end of lease disposition, (e) the Residual Value or the Final Contractual Payment.

(xiv)     Except as set forth on Schedule 6(h)(xiv), the final payment on each Performing Lease is a contractual obligation and not an optional payment.

(xv)     All payment obligations by any lessee pursuant to each Performing Lease are due to the Seller, and no payments are due to any third party originator. No Performing Lease requires any current or future payment to a third party originator.

It is understood that Buyer's acquisition of the Charged-Off Leases is on an as-is, where-is basis. It is further understood that the sole remedy for any breach of the representations and warranties with respect to any Lease other than a Performing Lease shall be monetary damages, and that the aggregate amount of all such damages shall be limited to a maximum of $200,000 for all such breaches.

(i)     Compliance. Seller operates the Business in compliance with all applicable federal and state statutes and all governmental regulations. There are no existing violations, orders, claims, citations, penalty assessments, orders, investigations or proceedings affecting the Assets or the Business.

(j)     Litigation. Except as set forth on Schedule 6(j), there is no action, suit or proceeding pending or, to the knowledge of any Seller, threatened against or affecting the Business or all or any portion of the Assets, in any court or before or by any Governmental Authority. To the knowledge of Seller, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any action, suit or proceeding affecting the Business. Seller is not in default with respect to any order of any court, Governmental Authority or agency or arbitration board or tribunal pertaining to the Business.

(k)     Assignability of Relationships. Except as set forth on Schedule 6(k), all of Seller's written Customer relationships with respect to the Performing Leases are assignable to Buyer without notice to or consent of any Person. Seller shall use its Best Efforts to, as promptly

8

as practicable but in no event later than the Closing Date, obtain consents and give notices, to the extent that any are required, in order to assign all such Customer relationships to Buyer at the Closing.

(l)     Brokers.  Except for The Alta Group, LLC, whose fee will be paid by Seller out of the proceeds of the Contemplated Transactions, no Person is entitled to any finder's fee, brokerage commission or similar payment by Seller in connection with or arising out of the Contemplated Transactions.

(m)     No Misstatements or Omissions.  These representations and warranties, the information disclosed in the schedules and exhibits hereto and the certificates and other documents delivered by Seller pursuant to this Agreement, when considered together and in light of one another, do not contain any untrue statement of material fact with respect to the Assets or the Assumed Liabilities or omit to state a material fact necessary to make the statements contained herein not misleading.  There is no fact of which Seller is aware with respect to the Assets or the Assumed Liabilities or the Business that Seller has not disclosed in writing to Buyer, the existence of which would have a material adverse effect on the Assets, considered as a whole.

(n)     Bulk Sales Compliance.  The sale of the Assets by Seller to Buyer pursuant to this Agreement will not violate any bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

7.     Representations and Warranties of Buyer.  Buyer represents and warrants to Seller as follows:

(a)     Organization.  Each Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Each Buyer has full corporate power and authority to execute and deliver the Transaction Documents and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

(b)     Authority.  Buyer has taken all action necessary to approve the Transaction Documents and the transactions contemplated thereby.  Buyer has all requisite corporate power and authority and has taken all action necessary in order to execute, deliver and perform its obligations under the Transaction Documents.  This Agreement has been duly authorized, executed and delivered and, prior to the Closing, the other Transaction Documents will have been, duly authorized and at Closing will be duly executed and delivered by Buyer and, assuming due execution and delivery by Seller, constitute or (with respect to the Transaction Documents other than this Agreement) will at Closing constitute, the legal, valid and binding obligations of Buyer, enforceable in accordance their terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting creditors' rights generally.

(c)     No Breach.  Except as set forth on Schedule 7(c), neither the execution and delivery of the Transaction Documents, nor compliance with the terms and provisions thereof, will conflict with or result in a breach of, or require any consent which has not been obtained as of the date hereof under the charter or by-laws of either Buyer, or any governmental

requirement, or any agreement or instrument to which either Buyer is a party or by which it is bound, or constitute a default under any such agreement or instrument.

(d)    Approvals. Other than as set forth on Schedule 7(d), no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any other Person are necessary for the execution, delivery or performance by either Buyer of the Transaction Documents or for the validity or enforceability thereof.

(e)    Previously Approved Agreements. Buyer shall enter into agreements with lessees of the Backlog provided such lessees continue to meet all requirements set forth in the applicable approval letter and such agreement or lease was approved by Seller in accordance with the Policies and Procedures.

(f)    Payment of Purchase Price. Buyer has access to sufficient funds with which to pay the Purchase Price on the Closing Date.

8.    Covenants of Seller Prior to Closing.

(a)    Access and Information. Between the date of this Agreement and the Closing Date, and upon reasonable advance notice received from Buyer, Seller shall (a) afford Buyer reasonable access, during regular business hours, to Seller's personnel, properties, and Records for the purpose of preparing for the transfer, and understanding the Business, and (b) afford Buyer access to the InfoLease and Shaw System Data Disks for the purpose of confirming data ascertained by Buyer during its due diligence; such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of Seller and does not violate applicable labor and employment laws; and (c) otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's understanding of the Business and the Assets.

(b)    Operation of the Business of Seller. Between the date of this Agreement and the Closing, Seller shall, except as otherwise directed by Buyer in writing:

(i)    conduct the Business only in the Ordinary Course of Business consistent with the Policies and Procedures;

(ii)    use its Best Efforts to preserve intact the current business organization of the Business, keep available the services of the officers, employees and agents of the Business and maintain the relations and good will of the Business with suppliers, Customers, landlords, creditors, employees, agents and others having business relationships with it (it being understood, however, that the Seller has heretofore informed some employees of the availability of positions in other parts of Seller's business, and to the extent that such opportunities were communicated prior to May 24, 2007);

(iii)    confer with Buyer prior to implementing operational changes of a material nature with respect to the Business;

(iv)    otherwise report periodically to Buyer concerning the status of the business, operations and finances of the Business;

        (v)　　keep in full force and effect, without amendment, all material rights relating to the Business;

        (vi)　　comply in all material respects with all Legal Requirements and contractual obligations applicable to the operations of the Business;

        (vii)　　continue in full force and effect all material insurance coverage pertaining to the Business under its existing policies or substantially equivalent policies;

        (viii)　　upon request from time to time, execute and deliver all documents, make all truthful oaths, testify in any Proceedings and do all other acts that may be reasonably necessary or desirable in the opinion of Buyer to consummate the Contemplated Transactions, all without further consideration;

        (ix)　　maintain all books and Records of Seller relating to the Business in the Ordinary Course of Business; and

        (x)　　notify Buyer prior to initiating any new Lease pertaining to equipment having a purchase price in excess of $500,000.

        (c)　　Negative Covenant. Except as otherwise expressly permitted herein, between the date of this Agreement and the Closing Date, Seller shall not without the prior written consent of Buyer, (a) take any affirmative action, or fail to take any reasonable action within its control, as a result of which any material adverse change, or any event or development which, individually or together with other such events, could reasonably be expected to result in a material adverse change in the Assets or the Business; (b) make any modification to any Lease except in the ordinary course of business, or in any Governmental Authorization; (c) initiate any new Lease that (i) does not have a credit-risk rating of five or better pursuant to the Policies and Procedures, or (ii) does not have an interest yield of seven percent or higher, calculated based on the cost to originate such Lease and acquire the Subject Equipment; or (d) enter into any compromise or settlement of any litigation, proceeding or governmental investigation relating to the Assets, the Business or the Assumed Liabilities.

        (d)　　Required Approvals. Seller has made, or as promptly as practicable after the date of this Agreement, Seller shall make all filings required by Legal Requirements to be made by it in order to consummate the Contemplated Transactions (including all filings under the HSR Act). Seller and Buyer shall cooperate with respect to all filings that Buyer elects to make or, pursuant to Legal Requirements, shall be required to make in connection with the Contemplated Transactions, provided, however, that Seller shall not be required to dispose of or make any change to its business, expend any material funds or incur any other unreasonable burden in order to comply with this Section 8(d). Seller also shall cooperate with Buyer in obtaining all necessary consents (including taking all actions requested by Buyer to cause early termination of any applicable waiting period under the HSR Act).

        (e)　　Notification. Between the date of this Agreement and the Closing, Seller shall promptly notify Buyer in writing if it becomes aware of (a) any fact or condition that causes or constitutes a breach of any of Seller's representations and warranties made as of the date of this Agreement or (b) the occurrence after the date of this Agreement of any fact or condition

that would or be reasonably likely to (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence of, or Seller's discovery of, such fact or condition. During the same period, Seller also shall promptly notify Buyer of the occurrence of any breach of any covenant of Seller in this Section 8 or of the occurrence of any event that may make the satisfaction of the conditions in Section 10 impossible or unlikely.

(f)    No Negotiation. Until such time as this Agreement shall be terminated pursuant to Section 12, the Seller shall not directly or indirectly solicit, initiate, encourage or entertain any inquiries or proposals from, discuss or negotiate with, provide any nonpublic information to or consider the merits of any inquiries or proposals from any Person (other than Buyer) relating to any sale, disposition, merger, business combination or other similar transaction with respect to the Business or the Assets. Seller shall notify Buyer of any such inquiry or proposal within twenty-four (24) hours of receipt or awareness. It is understood, however, that this Section 8(f) shall not prohibit Seller or The Alta Group, LLC from communicating with entities that have executed confidentiality agreements with Seller prior to May 23, 2007 that the Contemplated Transactions are in process and that they preclude negotiation with any other potential purchaser.

(g)    Best Efforts. Seller shall use its Best Efforts to cause the conditions in Sections 10 and 11(c) to be satisfied.

9.    Covenants of Buyer Prior to Closing.

(a)    Required Approvals. Buyer has made or, as promptly as practicable after the date of this Agreement, shall make, or cause to be made, all filings required by Legal Requirements (including all filings under the HSR Act) to be made by it to consummate the Contemplated Transactions. Buyer also shall cooperate with Seller with respect to all filings Seller shall be required by Legal Requirements to make, provided, however, that Buyer shall not be required to dispose of or make any change to its business, expend any material funds or incur any other unreasonable burden in order to comply with this Section 9(a).

(b)    Best Efforts. Buyer shall use its Best Efforts to cause the conditions in Sections 11 and 10(c) to be satisfied.

10.    Conditions Precedent of Buyer's Obligation to Close Transaction. Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)    Accuracy of Representations

(i)    Each of Seller's representations and warranties in this Agreement that does not contain an express materiality qualification shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing as if then made (subject, however, to updates in the case of scheduled items).

12

(ii)    Each of Seller's representations and warranties in this Agreement that contains an express materiality qualification, shall have been accurate in all respects as of the date of this Agreement, and shall be accurate in all respects as of the time of the Closing as if then made (subject, however, to updates in the case of scheduled items).

(b)    Seller's Performance. All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects.

(c)    Consents. Each of the consents identified on Schedule 10(c) attached hereto shall have been obtained and shall be in full force and effect.

(d)    Additional Documents. Seller shall have caused the documents and instruments required by Section 5(a) and the following documents to be delivered (or tendered subject only to Closing) to Buyer:

(i)    The articles of association and all amendments thereto of Seller, duly certified as of a recent date by the United States Office of the Comptroller of the Currency;

(ii)    A Contract File for each Lease (which may be held by Seller for Buyer pursuant to the Bailment Agreement);

(iii)    Releases of all Liens on the Assets in favor of any Person other than Seller, and assignments of all Liens in favor of Seller to Buyer, including without limitation, all necessary amendments to Financing Statements and transfer of title in motor vehicles;

(iv)    Certificates dated as of a date not earlier than the 30th business day prior to the Closing as to the good standing of Seller; and

(v)    Such other documents as Buyer may reasonably request for the purpose of: (w) evidencing the accuracy of any of Seller's representations and warranties; (x) evidencing the performance by Seller of, or the compliance by Seller with, any covenant or obligation required to be performed or complied with by Seller; (y) evidencing the satisfaction of any condition referred to in this Section 10; or (z) otherwise facilitating the consummation or performance of any of the Contemplated Transactions.

(e)    No Proceedings. Since the date of this Agreement, there shall not have been commenced or threatened against Seller or Buyer any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions or (b) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the Contemplated Transactions.

11.    Conditions Precedent of Seller's Obligation to Close Transaction. Seller's obligation to sell the Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller in whole or in part):

13

(a)    Accuracy of Representations. All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the time of the Closing as if then made.

(b)    Buyer's Performance. All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been performed and complied with in all material respects.

(c)    Consents. Each of the consents identified in Schedule 11(c) shall have been obtained and shall be in full force and effect.

(d)    Additional Documents. Buyer shall have caused to be delivered (or tendered subject only to Closing) to Seller such documents as Seller may reasonably request for the purpose of: (w) evidencing the accuracy of any of Buyer's representations and warranties; (x) evidencing the performance by Buyer of, or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer; (y) evidencing the satisfaction of any condition referred to in this Section 11; or (z) otherwise facilitating the consummation or performance of any of the Contemplated Transactions.

(e)    No Proceedings. Since the date of this Agreement, there shall not have been commenced or threatened against Seller or Buyer any Proceeding (i) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions or (ii) that may have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the Contemplated Transactions.

12.    Termination.

(a)    Termination Events. By notice given prior to or at the Closing, subject to Section 12(b), this Agreement may be terminated as follows:

(i)    by Buyer if a material breach of any provision of this Agreement has been committed by Seller and such breach has not been waived by Buyer or, prior to notice of termination from Buyer, been cured by Seller;

(ii)    by Seller if a material breach of any provision of this Agreement has been committed by Buyer and such breach has not been waived by Seller or, prior to notice of termination from Seller, been cured by Buyer;

(iii)    by Buyer if any condition in Section 10 has not been satisfied as of the date specified for Closing in the first sentence of Section 4 or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement), and Buyer has not waived such condition on or before such date;

14

     (iv)    by Seller if any condition in Section 11 has not been satisfied as of the date specified for Closing in the first sentence of Section 4 or if satisfaction of such a condition by such date is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement), and Seller has not waived such condition on or before such date;

     (v)    by mutual consent of Buyer and Seller;

     (vi)    by Buyer if the Closing has not occurred on or before July 31, 2007 (or August 31, 2007 in the event the applicable waiting period under the HSR Act has not expired or been terminated by July 24, 2007), or such later date as the parties may agree upon, unless the Buyer is in material breach of this Agreement; or

     (vii)    by Seller if the Closing has not occurred on or before July 31, 2007 (or August 31, 2007 in the event the applicable waiting period under the HSR Act has not expired or been terminated by July 24, 2007), or such later date as the parties may agree upon, unless the Seller is in material breach of this Agreement.

     (b)    Effect of Termination. Each party's right of termination under Section 12(a) is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 12(a), all obligations of the parties under this Agreement will terminate, except that the obligations of the parties in this Section 12(b) and Section 18 (except for those in Section 18(k)) will survive; provided, however, that, if this Agreement is terminated because of a breach of this Agreement by the nonterminating party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

     13.    Additional Covenants.

     (a)    Payment of All Taxes Resulting From Sale of Assets by Parties. Each party hereto shall pay in a timely manner all Taxes resulting from or payable in connection with the sale of the Assets pursuant to this Agreement, to the extent that such Taxes are imposed on such party by Legal Requirements.

     (b)    Payment of Other Retained Liabilities. If the failure to make any payments with respect to the Retained Liabilities will impair Buyer's use or enjoyment of or title to the Assets or conduct of the Business, Buyer may, at any time after the Closing Date, elect to make all such payments directly (but shall have no obligation to do so) and Seller shall reimburse Buyer for such amounts.

     (c)    Reports and Returns. Each party hereto shall timely prepare and file such reports and returns required by Legal Requirements relating to the Business, with respect to the period of time during which that party owned the Business.

     (d)    Assistance in Proceedings. The parties will cooperate with each other and their respective counsel in the contest or defense of, and make available its personnel and

provide any testimony and access to its books and Records in connection with, any Proceeding involving or relating to (a) any Contemplated Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction involving the Business.

(e)    Noncompetition, Non-solicitation and Non-disparagement.

(i)    Noncompetition. For a period of five (5) years after the Closing Date, Seller shall not, other than through an entity with which Seller engages in a merger or acquisition transaction and that already includes such a business at the time of the merger or acquisition, anywhere in the United States, directly or indirectly invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged in the third party origination business of equipment leases or financings of the size and for the equipment of the types for which Seller, as part of the Business, currently extends leases or financings ("Competing Business"). Notwithstanding the foregoing, nothing herein shall prevent Seller from acquiring, being acquired by or merging with another business that includes equipment leasing as part of its larger business.

(ii)    Nonsolicitation. For a period of five (5) years after the Closing Date, Seller shall not:

a.    solicit the equipment leasing or equipment financing business of any Person who is a third-party vendor or broker of such business;

b.    cause, induce or attempt to cause or induce a third-party vendor or broker of equipment leasing business to cease doing business with Buyer, or in any way interfere with its relationship with Buyer;

c.    cause, induce or attempt to cause or induce a third-party vendor or broker of equipment leasing business who has referred to Seller such business that is on the books of the Business on the Closing Date, or was on the books of the Business within the year preceding the Closing Date, to cease doing business with Buyer, or in any way interfere with its relationship with Buyer; or

d.    solicit for employment any employee of Buyer, or any Person set forth on Schedule 1(i), or in any way interfere with the relationship between Buyer and any of its employees, or any Person set forth on Schedule 1(i).

(iii)    Nondisparagement. After the Closing Date, Seller will not disparage the Business, Buyer, Buyer's business or any of Buyer's shareholders, directors, officers, employees or agents. After the Closing Date, Buyer will not disparage Seller, Seller's business or any of Seller's shareholders, directors, officers, employees or agents.

(iv)    Modification of Covenant. If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 13(e) is invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or

16

provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 13(e)(iv) will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. This Section 13(e)(iv) is reasonable and necessary to protect and preserve Buyer's legitimate business interests and the value of the Assets and to prevent any unfair advantage conferred on Seller. The parties hereto acknowledge and agree that any remedy at law for any breach of the provisions of this Section 13(e)(iv) would be inadequate, and Seller hereby consents to the granting by any court of an injunction or other equitable relief, without the necessity of actual monetary loss being proved, in order that the breach or threatened breach of such provisions may be effectively restrained.

(f)    Customer and Other Business Relationships. After the Closing, Seller will cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing prior to the Closing and relating to the Business, including relationships with Customers, employees, licensors, suppliers and others, and Seller will satisfy the Retained Liabilities in a manner that is not detrimental to any of such relationships. Seller will refer to Buyer all inquiries relating to the Leases. Neither Seller nor any of its officers, employees, agents or shareholders shall take any action that would tend to diminish the value of the Assets after the Closing or that would interfere with the business of Buyer to be engaged in after the Closing. Except for any third party equipment leasing or equipment financing origination business in the nature of the Business, nothing in this section shall require Seller to refer business to Buyer or preclude Seller from doing business with, or referring business to, other leasing companies.

(g)    Retention and Access to Records. After the Closing Date, Buyer shall retain for a period of not less than five (5) years, or such longer period as is consistent with Buyer's record-retention policies and practices those Records of Seller delivered to Buyer. Buyer also shall provide Seller reasonable access thereto, during normal business hours and on at least five days' prior written notice, to enable them to prepare financial statements or tax returns or deal with tax audits. After the Closing Date, Seller shall provide Buyer reasonable access to Records that are Excluded Assets and pertain to the Business, if any, during normal business hours and on at least five days' prior written notice, for any reasonable business purpose specified by Buyer in such notice.

(h)    Access to Premises. Until the termination of the Interim Servicing Agreement, Seller shall permit Buyer to access the premises of Seller to the extent necessary for Buyer to exercise its rights and discharge its obligations under the Interim Servicing Agreement, subject to the limitations and restrictions stated in the Interim Servicing Agreement.

(i)    Amendments of Financing Statements; Transfer of Motor Vehicle Title. Seller shall cooperate reasonably and provide assistance to Buyer to amend any Financing Statements and transfer title in any motor vehicles that are the subject of a Lease.

(j)    Transfer of Electronic Files. Seller shall cooperate with Buyer in the export of any electronic records and data files pertaining to any Leases from the Seller's systems to the Buyer's systems.

(k)    Further Assurances.  Subject to the proviso in Sections 8(d) and 9(a), the parties shall cooperate reasonably with each other in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions. If Seller receives any payments on, with respect to or arising out of the Leases, Seller shall forward such payments to Buyer promptly and no less frequently than weekly, either by endorsing and delivering the check or by depositing the check and delivering a bank check or wire transfer in an equivalent amount.  If Buyer or an Affiliate of Buyer determines that it is required to prepare audited financial statements with respect to the Business pursuant to Regulation S-X of the Securities and Exchange Commission, then Seller shall cooperate with Buyer and provide Buyer with such information as Buyer shall reasonably request to enable Buyer to prepare such financial statements.  The cost of preparing such financial statements shall be borne entirely by Buyer, and Buyer shall reimburse to Seller all out-of-pocket expenses and such internal costs as Seller reasonably allocates for its employees' time and overhead incurred by Seller in providing such cooperation and information, but as to such internal costs only to the extent that they exceed $5,000 in the aggregate.

(l)    Taxes with Respect to Leases.  Following the Closing, if Buyer receives any notice of unpaid property, sales or use taxes that were due prior to the Closing, but are alleged to be unpaid, Buyer shall promptly notify Seller, and Seller shall have the right and obligation of dealing with the taxing authority with respect to such allegations, and the obligation to pay such taxes (including any interest or penalties) if and to the extent that funds were collected from the lessee to cover such taxes.  If and to the extent such taxes are owing, but Seller did not collect funds from the lessee to cover such taxes, Buyer shall cooperate with Seller in collecting such taxes (including any interest or penalties) from the lessee or causing the lessee to pay such amounts directly to the taxing authority.  Notwithstanding the foregoing sentence, in the event the lessee does not pay such amounts to the taxing authority, Seller shall be liable for the payment of all such amounts owed to such taxing authority, and Seller shall thereupon be subrogated to the rights of Buyer to collect such amounts from the lessee.

(m)    Notice to Third Parties.  As soon as practicable following the Closing, Buyer shall file notices in all applicable governmental jurisdictions in which financing statements or titles are of record with respect to the Leases or Subject Equipment, as to the change in ownership of such Assets.  It is understood however, that in some instances this is the date on which the next tax filings are required to be filed in such jurisdictions.

(n)    Assignment of Additional Leases.  If any leases or loans are funded by Seller in the time period from the day after the Record Date until the Closing Date, and such leases or loans otherwise meet all of the requirements set forth in this Agreement for a Lease, then Buyer shall pay Seller 104.7643% of the Net Investment in such Lease, and immediately upon receipt of such payment, Seller shall assign such lease or loan to Buyer and such lease or loan shall become a "Lease" for purposes of this Agreement as if it had been listed on Schedule 1(a).

(o)    Allocation of Purchase Price.  Within thirty (30) days from the Closing Date, Seller and Buyer shall agree in writing on the allocation of the Assets and Assumed

18

Liabilities (the "Allocation"). Buyer and Seller agree to file Internal Revenue Service Form 8594 in accordance with the agreed upon Allocation and that no position inconsistent with the Allocation shall be taken by any party hereto before any Governmental Authority.

14.    Survival of Representations, Warranties, Covenants and Agreements.  The representations, warranties, covenants and agreements of Seller and Buyer contained in this Agreement will survive (a) until the fifth anniversary of the Closing Date with respect to the representations and warranties contained in Sections 6 and 7, except for any representations and warranties related to Taxes, which shall survive until the expiration of the relevant statute of limitations; (b) until the fifth anniversary of the Closing Date with respect to Section 13(e); and (c) in the case of all other representations and warranties and any covenant or agreement to be performed in whole or in part after the date hereof until the fourth anniversary hereof, except that any representation, warranty, covenant or agreement that would otherwise terminate in accordance with clause (c) will continue to survive if a Claim Notice shall have been timely given on or prior to such termination date, until the related claim for indemnification has been satisfied or otherwise resolved.

15.    Indemnification.  Seller shall indemnify, defend and hold harmless Buyer and its officers, directors, employees, agents and Affiliates, and Buyer shall indemnify, defend and hold harmless Seller and its officers, directors, employees, agents and Affiliates, from any Loss or Losses arising out of or by reason of any breach of any of Seller's, on the one hand, and Buyer's, on the other hand, covenants, representations and warranties set forth herein. In addition, Seller shall indemnify, defend and hold harmless Buyer and its officers, directors, employees, agents and Affiliates from any Losses arising out of the Retained Liabilities or the Excluded Assets. Buyer shall indemnify, defend and hold harmless Seller and its officers, directors, employees, agents and Affiliates from any Losses arising out of the Assumed Liabilities or Assets, arising out of events occurring after the date hereof.

16.    Method of Asserting Claims.  All claims for indemnification by any indemnified party hereunder will be asserted and resolved as follows:

(a)    In the event of any Third Party Claim, the indemnified party shall deliver written notification thereof to the indemnifying party with reasonable promptness, enclosing a copy of all papers served, if any, and specifying the nature of the Third Party Claim, together with the amount or, if not then reasonably ascertainable, the estimated amount, determined in good faith, of the Third Party Claim (a "Claim Notice"). The indemnifying party will notify the indemnified party as soon as practicable, but in any case within 30 days of receipt of a Claim Notice (the "Dispute Period"), whether the indemnifying party disputes its liability to the indemnified party and whether the indemnifying party desires, at its sole cost and expense, to defend the indemnified party against such Third Party Claim.

(b)    If the indemnifying party notifies the indemnified party within the Dispute Period that the indemnifying party desires to defend the indemnified party with respect to the Third Party Claim, then the indemnifying party will have the right to defend, with counsel reasonably satisfactory to the indemnified party, at the sole cost and expense of the indemnifying party, such Third Party Claim by all appropriate proceedings, which proceedings will be vigorously and diligently prosecuted by the indemnifying party to a final conclusion or will be settled at the discretion of the indemnifying party (but only with the consent of the indemnified

19

party in the case of any settlement that provides for any relief other than the payment of monetary damages).

(c)     If the indemnifying party fails to notify the indemnified party within the Dispute Period that the indemnifying party desires to defend the Third Party Claim, or if the indemnifying party gives such notice but fails to prosecute vigorously and diligently or settle the Third Party Claim, or if the indemnifying party fails to give any notice whatsoever within the Dispute Period, then the indemnified party will have the right to defend, at the sole cost and expense of the indemnifying party, the Third Party Claim by all appropriate proceedings, which proceedings will be prosecuted by the indemnified party in a reasonable manner and in good faith or will be settled at the discretion of the indemnified party.

(d)     If the indemnifying party notifies the indemnified party that it does not dispute its liability to the indemnified party with respect to the Third Party Claim, the Loss in the amount specified in the Claim Notice will be conclusively deemed a liability of the indemnifying party and the indemnifying party shall pay the amount of such Loss to the indemnified party on demand. If the indemnifying party has timely disputed its liability with respect to such claim, the indemnifying party and the indemnified party will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations within a reasonable period of time, such dispute shall be resolved by litigation in a court of competent jurisdiction.

(e)     In the event any indemnified party has a claim against any indemnifying party that does not involve a Third Party Claim, the indemnified party shall deliver a Claim Notice with reasonable promptness to the indemnifying party. If the indemnifying party notifies the indemnified party that it does not dispute the claim described in such Claim Notice or fails to notify the indemnified party within the Dispute Period whether the indemnifying party disputes the claim, the Loss in the amount specified in the Claim Notice will be conclusively deemed a liability of the indemnifying party and the indemnifying party shall pay the amount of such Loss to the indemnified party on demand. If the indemnifying party has timely disputed its liability with respect to such claim, the indemnifying party and the indemnified party will proceed in good faith to negotiate a resolution of such dispute, and if not resolved through negotiations within a reasonable period of time, such dispute shall be resolved by litigation in a court of competent jurisdiction.

17.    Notices.    All notices and other communications hereunder shall be in writing, hand delivered or sent by express mail service or via facsimile, to the addresses or facsimile numbers set forth below (or at such other address as a party may hereafter designate for itself by notice to the other party as required hereby):

If to Buyer:

LEAF Financial Corporation
1818 Market Street
Philadelphia, Pennsylvania 19103
Attn: Crit DeMent
Fax No.: (215) 640-6363
and Attn: Miles Herman
Fax No.: (215) 640-6330

20

with a copy to:

    Ledgewood
    1900 Market Street
    Philadelphia, Pennsylvania 19103
    Attn: J. Baur Whittlesey, Esquire
    Fax No.: (215) 735-2513

If to Seller:

    Pacific Capital Bank, N.A.
    1 South Los Carneros Road
    Goleta, California 93117
    Attn: Frederick W. Clough, General Counsel
    Fax No.: (805) 882-3856

with a copy to:

    Manatt, Phelps & Phillips, LLP
    695 Town Center Drive
    Costa Mesa, California 92626
    Attn: Ellen R. Marshall, Esquire
    Fax No.: (714) 371-2550

18.    <u>Miscellaneous</u>.

    (a)   <u>Governing Law</u>. This Agreement shall be governed by the law of the State of California, and shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, assigns and personal representatives.

    (b)   <u>Entire Agreement; Amendments</u>. This Agreement, and the Transaction Agreements set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as contained herein. This Agreement may not be changed orally but only by an agreement in writing, duly executed by or on behalf of the party or parties against whom enforcement of any waiver, change, modification, consent or discharge is sought.

    (c)   <u>Binding Effect</u>. All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their legal representatives, heirs, successors and permitted assigns, whether so expressed or not.

    (d)   <u>Severability</u>. If any provision of this Agreement or any other agreement entered into pursuant hereto is contrary to, prohibited by or deemed invalid under applicable law or regulation, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given full force and effect so far as possible. If any provision of this Agreement may be construed in

21

two or more ways, one of which would render the provision invalid or otherwise voidable or unenforceable another of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.

(e)     Captions. The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

(f)     No Construction Against Draftsmen. The parties acknowledge that this is a negotiated agreement, and that in no event shall the terms hereof be construed against either party on the basis that such party, or its counsel, drafted this Agreement.

(g)     Expenses. Except as otherwise provided in this Agreement, each party hereto shall pay the expenses incurred by or on behalf of such party in connection with the transactions contemplated by this Agreement, including but not limited to, expenses in connection with the preparation, authorization, execution and performance of this Agreement and all fees and expenses of such party's brokers, finders, agents, representatives, counsel and accountants. Notwithstanding the foregoing, Buyer and Seller will each pay one-half of the HSR Act filing fee.

(h)     Knowledge. Certain of the representations and warranties in this Agreement are made "to the knowledge" of Seller. Such phrase shall mean either (i) the actual knowledge of any individual set forth on Schedule 18(h); or (ii) any knowledge which such persons should have known had they acted in the ordinary course of business.

(i)     Assignment. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder may be assigned by any party without the consent of the other parties; provided, however, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless will remain responsible for the performance of all of its obligations hereunder), and (c) make a collateral assignment of its rights hereunder to its lender(s). In the event of an assignment or designation pursuant to clauses (a) or (b) of the prior sentence prior to the Closing Date, any documents to be delivered by Seller or Buyer pursuant hereto shall be appropriately modified to give effect to such assignment or designation.

(j)     Waiver of Jury Trial. THE PARTIES HERETO WAIVE EACH OF THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY FOR ANY CAUSE OF ACTION ARISING UNDER OR RELATED TO THIS AGREEMENT TO THE EXTENT THAT SUCH A WAIVER IS PERMITTED BY LAW.

(k)     Counterparts. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Confirmation of execution by electronic transmission of a facsimile signature page shall be binding upon any party so confirming.

IN WITNESS WHEREOF, intending to be legally bound hereby, the parties have executed and delivered this Asset Purchase Agreement as of the date first above written.

SELLER:

PACIFIC CAPITAL BANK, N.A.

By: _Edwin E. Stanefelt_
Its: _Executive Vice President_

BUYER:

LEAF FINANCIAL CORPORATION

_____

By:
Its:

LEAF FUNDING, INC.

_____

By:
Its:

LEAF COMMERCIAL FINANCE CO., LLC

_____

By:
Its:

23

IN WITNESS WHEREOF, intending to be legally bound hereby, the parties have executed and delivered this Asset Purchase Agreement as of the date first above written.

SELLER:

PACIFIC CAPITAL BANK, N.A.

_____

By:
Its:


BUYER:

LEAF FINANCIAL CORPORATION

_____

By:  Crit DeMent
Its:  Chairman, CEO


LEAF FUNDING, INC.

_____

By:  Miles Herman
Its:  SVP, COO


LEAF COMMERCIAL FINANCE CO., LLC

_____

By:  Miles Herman
Its:  President, COO


23